IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

CHARLES DEREK ARTHUR,

       Plaintiff,

v.                                                                        CIVIL ACTION NO. 3:15-13159

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered January 5, 2016 (Document No. 10.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 12 and 13.)

The Plaintiff, Charles Derek Arthur (hereinafter referred to as "Claimant"), filed an application for DIB on June 26, 2011 (Tr. at 372-373, 404.), alleging disability as of June 10, 2011 (Tr. at 372.), due to COPD [chronic obstructive pulmonary disease] and emphysema. (Tr. at 409.) The claim was denied initially and upon reconsideration. (Tr. at 228-232, 234-240.) On July 25, 2012, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 271-272.)

1

A hearing was held on July 31, 2013, before the Honorable Charlie Paul Andrus. (Tr. at 158-194.) Both Claimant testified and the Vocational Expert ("VE") Anthony Michael. (Tr. at 187-194). Thereafter, ALJ Andrus left the agency and this matter was reassigned to ALJ Michele Kelley; the administrative hearing was rescheduled for March 25, 2014. (Tr. at 115.) During the subsequent hearing, Claimant testified, as well as VE Dwight McMillion. (Tr. at 119-156.) By decision dated April 11, 2014, the ALJ determined that Claimant was not under a disability since June 10, 2011, his alleged onset date. (Tr. at 90-109.) The ALJ's decision became the final decision of the Commissioner on August 20, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) On September 15, 2015, Claimant filed the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2009). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1

2

to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2009). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, June 10, 2011. (Tr. at 95, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "COPD and degenerative disc disease of the spine," which were severe impairments. (Tr. at 95, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 98, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light level work as follows:

> [T]he [C]laimant has the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b). [He] can lift and carry, push

and pull 10 pounds frequently and 20 pounds occasionally. He can walk and stand six hours out of an eight-hour workday and sit for six hours in an eight-hour workday. He can occasionally balance, stoop, kneel, crouch, and crawl. He needs to avoid concentrated exposure to extreme cold, extreme heat, and humidity and wetness. He needs to avoid even moderate exposure to fumes, odors, dust, gases, and poor ventilation. He should not have a job where he is required to read instructions or write reports.

(Tr. at 98-99, Finding No. 5.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 102, Finding No. 6.) On the basis of the VE's testimony taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a grader/sorter, machine tender/operator, and hand packer, at the light level of exertion. (Tr. at 103, Finding No. 10.) On this basis, benefits were denied. (Id., Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined substantial evidence as:

Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals that the decision of the Commissioner is supported

4

by substantial evidence.

<u>Claimant's Background</u>

Claimant was born on June 14, 1960, and was 53 years old at the time of the administrative hearing, March 25, 2014, and 51 years old at the time of his alleged disability onset date, which is defined by the regulations as an individual closely approaching advanced age. (Tr. at 102, 372.) Claimant has a limited education, having quit school in the ninth grade. (Tr. at 102, 165, 410.) In the past, Claimant worked as an assembler, cook, laborer, and stocker. (Tr. at 410.) He has met the requirements for insured worker status through March 31, 2017. (Tr. at 95.)

<u>The Medical Record</u>

The undersigned has reviewed all the evidence of record, including the medical evidence of record, and briefly will address that evidence.

<u>St. Mary's Medical Center</u>

On June 24, 2011, Claimant underwent an x-ray due to complaints of back and chest pain. (Tr. at 493.) Though multiple nodules throughout both lungs were located, the lungs were otherwise clear and there was no evidence of acute cardiopulmonary disease. (<u>Id</u>.) Due to complaints of neck pain, on September 28, 2011, an MRI taken of Claimant's cervical spine indicated that there was "diffuse cervical spondyloysis with moderate canal stenosis noted at C4-5 and C5-6 and mild to moderate spinal canal stenosis noted at C6-7. Predominately right-sided neural foraminal stenosis noted at several levels[.]" (Tr. at 568.)

After the administrative hearing, Claimant submitted additional records to the Appeals Council; on June 22, 2015, Claimant presented to St. Mary's Medical Center-Emergency Department and was seen by Dr. Naaman Bell, M.D., for his complaints of chest pain, which was

determined to be costochondritis, inflammation of the cartilage joining the ribs to the breastbone, the cause for which "is not known . . . often occur[ring] during times of emotional distress[,] usually disappear[ing] within one to two weeks[.]" (Tr. at 9-10.) Claimant was instructed to continue use of ibuprofen or Tylenol as needed for pain. (Tr. at 9.)

Ultimate Health Services, Inc. d/b/a Huntington Internal Medicine Group

From May 10, 2010 through August 17, 2011, Claimant was treated for COPD through medications due to his complaints of shortness of breath, chest pain and a positive history of smoking. (Tr. at 494-531.) On a June 21, 2010 follow-up visit, Claimant reportedly was doing "some better since using the Spiriva" though continued to complain of shortness of breath, especially when it is hot outside. (Tr. at 529.) during a follow-up visit on July 19, 2010, Claimant continued to complain of shortness of breath, and was prescribed to continue his Spiriva and Ventolin HFA; due to complaints of anxiety, Claimant was continued with Zoloft medication. (Tr. at 527.) A radiology report indicated that on July 3, 2011, COPD with emphysema and fibrosis were present, otherwise no active pulmonary or cardiac disease. (Tr. at 495.)

River Park Hospital

From July 28, 2012 through August 3, 2012, Claimant was treated at River Park Hospital for depression, suicidal ideation, and substance abuse. (Tr. at 586-596.) The cause for Claimant's then recent substance abuse was due to impending divorce. (Tr. at 586.) At admission, Claimant denied neck pain, chest pain or palpitations, shortness of breath, cough hemoptysis, or wheezing. (Tr. at 593.) Other systems reviews were negative, although Claimant complained of nausea. (Id.) Claimant sought help with getting off his medications and for the detox program, as he advised that he was going through withdrawals from use of marijuana and Lortab (Id.), which was

corroborated by positive drug screen of cannabinoids and opiates. (Tr. at 591.) His GAF score was scaled at 35.[1] (Tr. at 586.) Claimant advised that he was fired from Kroger two to three months prior, and recently from Goodwill due to his substance abuse. (Id.)

Claimant reported that he attended school up to the ninth grade, but had academic problems primarily due to his ADHD and ADD-like symptoms. (Tr. at 588.) On cognitive exam, Claimant was alert and oriented to time, place, person and situation. (Id.) Claimant presented some limitations with attention span. (Id.) He was not able to spell any of the five letter words out of three trials. (Id.) When used five digits, he still struggled with recalling them backwards and only was able to come up with either one or two digits in several trials. (Id.) Claimant's overall intellectual functioning appeared average, and it "was suspected that his overall cognitive issues appeared, on the surface, might be related to his ADD symptoms. (Tr. at 588-589.) During his treatment at River Park, Claimant was placed on opiate detox withdrawal protocol, but because of his COPD, Claimant was given Spiriva and Ventolin. (Tr. at 591.) By August 3, 2012, Claimant was stable to return home, and discharged with Seroquel, Restoril, a Ventoline inhaler, and Spiriva. (Tr. at 592.)

Mildred Mitchell-Bateman Hospital

Submitted directly to the Appeals Council on July 9, 2015, Claimant provided pleadings concerning an application for involuntary commitment for a mental health examination due to allegations that Claimant was addicted to drugs, alcohol and other substances, and was mentally

---

[1] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 31-40 indicates that the person has "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

ill. (Tr. at 698-714.) The application was filed on or about June 30, 2011 by a registered nurse/crisis specialist at River Park Hospital. (Tr. at 701-705.) It was alleged that Claimant was suicidal and began abusing Lortab because his wife wanted a divorce after 32 years of marriage. (Tr. at 702.) During an initial examination at River Park Hospital on June 30, 2011, Ms. Jamie Armentrout, M.A., a licensed psychologist, found that Claimant should be committed for a period of hospitalization for further evaluation. (Tr. at 713-714.) Ms. Armentrout noted that Claimant reported medications for blood pressure and COPD, but he quit taking them a month ago. (Tr. at 710.) However, there were no medical conditions noted that required immediate attention. (Id.) With regard to his mental health, Claimant was diagnosed with major depressive disorder, recurrent, severe alcohol and opiate dependence, without psychotic features, and a GAF score of 41.[2] (Tr. at 713.)

Valley Health Systems, Inc.

Claimant had been a patient at Valley Health since May 28, 2013 (Tr. at 682.); the record indicates that Claimant had been under the care of Amy Garmestani, M.D. from January 2, 2014 (Tr. at 696.) through May 12, 2015 (Tr. at 27.). Initially, Claimant was being treated for COPD and acute lymphadenitis, due to swollen lymph node on left side of throat, for which amoxicillin was prescribed. (Tr. at 696-697.) Claimant's medications were Albuterol Sulfate (2.5 MG/3ML), CeleXa 20 MG tablets, Hydrochlorothiazide 25 MG tablets, Levothyroxine Sodium 25 MCG tablets, MetFORMIN HCl 500 MG tablets. (Tr. at 695.) By February 6, 2014, additional medications were prescribed due to Claimant's ongoing complaint of feeling "'something'

---

[2] See, fn. 1: a GAF rating of 41-50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

pressing against his throat." (Tr. at 692.): Advair Diskus 250-50 MCG and a Spiriva Handihaler. (Tr. at 691.)  During a follow-up appointment on March 10, 2014, Claimant was seen for ongoing care of his COPD, and to address t cervical mass that had developed on his left side. (Tr. at 725.) Claimant did not report any chest pain or discomfort, although he noticed more wheezing and orthopnea. (Tr. at 723.) Claimant complained of pressure and a burning sensation of his left knee and that his neck felt like "someone is shoving a knife in [it]." (Id.) At a follow-up appointment on April 1, 2014, Dr. Garmestani did not observe any localized swelling of the leg, although Claimant was complaining of a sore throat, PND and cough, and was still concerned over the swelling along the left side of his neck. (Tr. at 719-721.) A CT scan of the neck was negative. (Tr. at 718.) On May 6, 2014, Claimant returned to Dr. Garmestani for refills on all medications; it was noted that he had been prescribed a knee brace and given a steroid injection for his left knee pain. (Tr. at 715.)

Submitted to the Appeals Council after the administrative hearing, Claimant provided additional treatment records from October 2, 2014 through May 12, 2015. (Tr. at 11-63.) During a "sick visit"[3] on October 2, 2014, Dr. Garemstani performed a review of systems, finding Claimant's skin, general appearance, head, neck, ears, nose, throat, and pharynx normal. (Tr. at 58-59.) Of Claimant's pulmonary system, "lung auscultation revealed abnormalities scattered expiratory wheezes", otherwise, "respiratory movements were normal." (Tr. at 59.) Claimant's cardiovascular examination was normal. (Id.) Dr. Garmestani indicated under the "self care measures" heading for Claimant: "lose weight" and "patient education using written material and counseling given to patient regarding proper nutrition/diet and written material and counseling

---

[3] Claimant presented with increase in shortness of breath and wheeze, production cough and nasal congestion. (Tr. at 57.)

given to patient regarding exercise/physical activity." (Tr. at 60.) On November 18, 2014, Claimant was seen by Dr. Garmestani as a walk-in patient: all systems were reported as normal, though Claimant presented with complaints of a swollen prostate. (Tr. at 47, 53.) Under the "assessment" heading, Dr. Garmestani stated that "[w]ritten materials and counseling given to patient regarding proper nutrition" and "[w]ritten materials and counseling given to patient regarding exercise/physical activity." (Tr. at 49, 55.) Claimant was diagnosed with "benign prostatic hypertrophy, male erectile dysfunction, and primary insomnia." (Id.) On December 11, 2014, Claimant presented to Dr. Garmestani for a follow-up on his insomnia. (Tr. at 43-46.) Review of systems were virtually unchanged from the prior visit, although Claimant was diagnosed with "bronchitis – likely viral in etiology" and was directed to continue to use inhalers daily. (Tr. at 45.) During a "sick visit" on January 6, 2015, Claimant presented with complaints of fever, body aches, chills, cough and nasal congestion that had been ongoing for three to four days. (Tr. at 38.) Claimant was ultimately diagnosed with influenza, chronic bronchitis with acute exacerbation and prescribed promethazine-DM 6.25-15 MG/5 ML syrup and a Z-pak. (Tr. at 40-41.) On March 31, 2015, Claimant presented to Dr. Garmestani with complaints of a "burning sensation along the plantar surface of his feet." (Tr. at 31.) Claimant was diagnosed with diabetes mellitus, secondary diabetes mellitus with peripheral neuropathy, osteoarthritis, and idiopathic peripheral autonomic neuropathy. (Tr. at 34.) Claimant had a follow-up visit on May 12, 2015 regarding the pain along the plantar surface of his left foot. (Tr. at 27-30.) This record is virtually unchanged from previous visit records, though Claimant was to be seen by an orthopedist regarding his foot pain. (Tr. at 29.)

Marshall Health Internal Medicine-Byrd Clinical Center

Claimant was treated by Alejandro Lorenzana, M.D. from July 1, 2011 through September 10, 2012 at Marshall Health concerning his dyspnea and lung nodule. (Tr. at 630-681.) During the initial visit on July 1, 2011, Claimant complained of exertional dyspnea, with daily wheezing and coughing, as well as back pain on the right flank area. (Tr. at 679.) A CT chest scan with IV contrast was administered on July 6, 2011 wherein "some minor scarring is noted posteriorly in the right lower lobe. Old rib fracture is noted inferiorly posteriorly on the left which has healed with lack of bony union. Scattered calcified granulomata are noted in the upper lobes and superior segment of the lower lobes. No acute process. Evidence of prior granulomatous disease. No suspicious lung mass is noted. No evidence of acute or chronic P.E. Evidence of prior trauma. Overall impression is that of negative exam." (Tr. at 532-540, 672-678.)

A pulmonary function test was administered to Claimant on September 7, 2011; the findings were "moderate COPD and mild restrictive pulmonary disease with improvement after bronchodilator." (Tr. at 544-549.)

Scott Orthopedic Center

Claimant was seen by Dr. Kyle R. Hegg, M.D. on July 15, 2014 for left knee pain. (Tr. at 65.) On visual examination, both knees appeared normal, however, some early x-ray evidence of arthritis warranted a prescription for physical therapy and a cortisone injection into his left knee. (Tr. at 66.) On August 21, 2014, Dr. Hegg prescribed a knee brace for Claimant. (Tr. at 69.)

Gregory D. Borowski, DPM

Submitted to the Appeals Council, a record entitled "Routine Foot Care" dated September 8, 2014 referencing diabetic nail care and paring calluses: Claimant's nails were trimmed and debrided, as well as calluses pared and cut, bilaterally. (Tr. at 71.)

11

Opinion Evidence

Dr. A. Rafael Gomez, M.D.

Dr. Gomez is a State agency consultant who provided a Disability Determination Explanation dated March 2, 2012 when Claimant's DIB claim was at the reconsideration level. (Tr. at 212-222.) Therein, Dr. Gomez provided a physical residual functional capacity assessment on which he opined that Claimant could lift 20 pounds occasionally and 10 pounds frequently; could stand and walk about six hours of an eight-hour day and sit about six hours in an eight-hour day; could occasionally climb, balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to extreme cold; and should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. at 218-219.)

Dr. Philip Comer, Ph.D.

Another State agency consultant, Dr. Comer completed a form Psychiatric Review Technique dated September 9, 2011, on which he opined that Claimant's affective and anxiety disorders (as secondary diagnoses) were not severe impairments (Tr. at 208.) He further opined that Claimant would have mild limitations in activities of daily living, social functioning, and concentration, persistence, and pace, although acknowledging that the record demonstrated evidence of one or two episodes of decompensation, each of extended duration. (Id.)

Dr. Timothy Saar, Ph.D.

State agency consultant Dr. Saar provided an opinion identical to Dr. Comer's in a form Psychiatric Review Technique dated March 22, 2012. (Tr. at 217.)

H. Hoback Clark, M.D.

Dr. Clark, a DDS non-examiner provided a Case Analysis dated April 14, 2012. (Tr. at

12

574.) Dr. Clark determined that there was insufficient evidence of Claimant's mental status to provide a proper determination of functional limits and advised Claimant's treating physicians' who had diagnosed Claimant with anxiety and depression and treated him for same with medication would be better suited to determine such limits. (Id.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant alleges that the ALJ's decision is not supported by substantial evidence because the ALJ erred at step five of the sequential process insofar as the ALJ failed in her duty to develop the record regarding Claimant's ability to read and write. (Document No. 12 at 7-10.) Claimant contends that the administrative record included conflicting evidence regarding Claimant's literacy. (Id. at 8.) Claimant testified that he quit school in the ninth grade, however the record does not support the ALJ's finding that he had a ninth grade literacy level, or a "limited education." (Id.) Claimant argues that the ALJ placed more weight on his Adult Function Report and Work History Report forms which indicated that he could read and write, however, he testified during the hearing that someone completed them for him. (Id.) Claimant argues that he was ashamed of his illiteracy and hid it from others, including lying about it. (Id.) Claimant testified that he attended literacy classes at his local library until his instructor died, but from her, he learned that he read on a first grade level. (Id.) Claimant contends that a hospital evaluation performed in July 2012 illustrates Claimant's inability to spell any of the five-letter words given to him in three trials. (Id.)

Claimant argues that the ALJ failed to properly evaluate the conflicting evidence, and ignored the evidence that contradicted her opinion. (Id. at 9-10.) An example of this is from the July 2012 evaluation from which the ALJ noted Claimant's average intellectual functioning, but failing to acknowledge the reference to Claimant's inability to spell the five-letter words in three

trials. (Id. at 9.) Further, Claimant asserts that the record contained no formal testing of Claimant's ability to read or write, and the ALJ could have ordered a consultative examination of his literacy to fully develop the record in this area of his disability, however, she did not do so. (Id. at 10.) Claimant contends that proper development of the record pertaining to his ability to read and write was especially important in order to determine his disabled status under the Medical-Vocational Rule 209.[4] (Id. at 11.)

In response, the Commissioner asserts that there was substantial evidence supporting the ALJ's determination that Claimant was not disabled, because a significant number of alternative jobs were found to exist that the Claimant could do based on his limitations. (Document No. 13 at 8.) The Commissioner argues that Claimant's entire argument on the issue of his alleged illiteracy is without merit because the substantial evidence showed that he had a "limited education." (Id. at 10.) The Commissioner contends that the record showed that Claimant attended school through the ninth grade; that Claimant informed the Agency through his Disability Report forms that he could read, write, and understand English; that Claimant indicated through an Adult Function Report that he was able to pay bills, count change, handle a savings account, and use a checkbook/money orders; that Claimant indicated that with regard to written instructions, he has to read them multiple times; and that Claimant indicated on Agency forms that he himself completed them. (Id. at 11.) Finally, during Claimant's hospitalization at River Park Hospital, Mark Hughes, M.D. found Claimant to have average intellectual functioning. (Id. at 12.) The Commissioner argues that none of these instances support Claimant's alleged illiteracy. (Id.)

The Commissioner further asserts that the case at bar is analogous to Joines v. Colvin, No.

---

[4] See 20 C.F.R. Part 404, Subpart P, App. 2, Table 2, Rule 202.09.

3:14-cv-00396-MOC, 2015 WL 1249579, at *9-10 (W.D.N.C. Mar. 18, 2015). (Id.) The claimant

therein, similarly to Claimant herein, indicated in a Disability Report that he could "read and

understand English" and "write more than [his] own name in English" as well as attended school

through the ninth or tenth grade. (Id.) The Commissioner points out that in that case, the district

court held that the record supported a finding that the claimant had a "limited education" pursuant

to Social Security Regulations. (Id.) In that case, as in the case at bar, the evidence concerning the

claimant's literacy was conflicting, however, it is not the Court's place to reweigh the evidence,

just to ensure that legal standards were properly employed[5], nevertheless, substantial evidence

supported the ALJ's finding that Claimant herein was not illiterate, just as the ALJ did in Joines.

(Id. at 12-13.)

The Commissioner further asserts that the ALJ did not find Claimant entirely credible, and

therefore did not have to accept Claimant's representations of his level of illiteracy. (Id. at 13.)

Pursuant to 20 C.F.R. § 404.1529(c), the ALJ is responsible for credibility determinations[6]; the

Commissioner argues that the Court "must accept the ALJ's credibility determination except in

'exceptional circumstances.'" Edelco, Inc. v. NLRD, 132 F.3d 1007, 1011 (4th Cir. 1997). (Id. at

14.) The Commissioner provides several examples of Claimant's inconsistencies between his

testimony and the record:

1. [Claimant] testified his drug and alcohol abuse started six months prior to his
   admission (Tr. at 100, 137.), but medical records revealed a thirty-year history of
   heroin, opiate, and marijuana use (Tr. at 100, 586.);

2. [Claimant] initially testified that he stopped working at Kroger's and Goodwill
   because he "couldn't do it" (Tr. at 100, 133-35, 166-67.), but was evasive as to
   further questioning on the subject (Tr. at 100, 134-35.), and medical records
   indicated that he was fired due to substance abuse (Tr. at 100, 586.);

---

[5] Richardson v. Perales, 402 U.S. 389, 390 (1971); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).
[6] Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984).

3. The evidence revealed conflicting statements about [Claimant's] smoking habits, and [Claimant] admitted that he lied to his doctor about when he quit smoking (Tr. at 100, 138-39, 497, 501, 505, 541, 587, 651.);

4. [Claimant] testified as to a number of orthopedic injuries following a 1991 motorcycle accident (Tr. at 100, 125-26.), but the record shows no treatment records or clinical findings supporting such claims, and [Claimant] had a normal gait and no motor, sensory, or reflex loss (Tr. at 100, 589-90, 593-95, 625, 632, 642, 658, 681, 689.);

5. [Claimant] complained of significant impairment in his left hand (Tr. at 100, 126.), but x-rays showed only mild degenerative impairment (Tr. at 100, 603.);

6. Despite claiming that he could not read or write (Tr. at 173-74), [Claimant] indicated in a Disability Report that he could read and write (Tr. at 100, 408.), and admitted that he could pay bills, handle a savings account, count change, use a checkbook/money orders, and could follow written instructions if he read them multiple times (Tr. at 100, 427, 429.). (Id.)

The Commissioner asserts that all the aforementioned shows that the ALJ's credibility determination was supported by substantial evidence. (Id. at 15.)

Moreover, regarding Claimant's argument that the ALJ should have ordered a consultative examination of Claimant's ability to read and write, the Commissioner argues that the burden to prove disability is on Claimant. (Id.) The ALJ's duty to fully and fairly develop the record does not include a duty to act as a claimant's counsel.[7] (Id.) The Commissioner contends that Claimant could have provided proof of his illiteracy by submitting school records or even requested himself a consultative examination, but he did not. (Id.) In addition to Fourth Circuit holdings, the Commissioner provided one decision from this jurisdiction that underscores a claimant's representative's duty to furnish evidence to prove a disability: Roberts v. Astrue, No. 6:11-cv-00684, 2012 WL 7658627, at *9 (S.D.W.V. Oct. 23, 2012), adopted by 2013 WL 842475

---

[7] Bell v. Chater, 57 F.3d 1065 (4th Cir. 1995).

16

(S.D.W.V. Mar. 6, 2013). (Id. at 16.) After Claimant's first hearing before ALJ Andrus, the record was held open for the submission of additional evidence, but Claimant's counsel provided none and did not request a consultative examination at that first hearing or in the second one. (Id.) In sum, the Commissioner argues that the ALJ had no duty to provide evidence of Claimant's disability, and had discretion as to whether to order a consultative examination per 20 C.F.R. § 404.1519a. (Id. at 16-17.)

The Commissioner concludes that this Court is not permitted to reweigh the evidence and substitute its judgment for that of the ALJ's. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). (Id. at 17.) The Commissioner asks the Court to affirm the Commissioner's decision because it was supported by substantial evidence. (Id.)

Claimant finally alleges that the ALJ erred in finding that Claimant had a limited education because it was not supported by substantial evidence, and further, the Commissioner's couching of Claimant's illiteracy as a credibility issue is flawed. (Document No. 14 at 2-4.) Specifically, Claimant asserts that the Commissioner's citing the Joines case about the illiteracy issue is not analogous to the case at bar because the age of the claimant therein was presumably a "younger individual" based on the VE's testimony that illiteracy would not affect the claimant's ability to perform other work at the light level, whereas Claimant was "an individual approaching advanced age." (Id. at 2.) Claimant argues that the Fifth Circuit[8] has specifically addressed the error in an ALJ's sole reliance on a claimant's answers on Social Security forms to determine education and literacy status. (Id.) Unless a claimant's literacy is tested, the forms themselves have limited value. (Id.) Claimant cites a recent case, McCarter v. Colvin, 2016 U.S. Dist. LEXIS 12837 (S.D. Miss.

---

[8] Albritton v. Sullivan, 889 F.2d 640, 643 n. 2 (5th Cir. Miss. 1989).

Feb. 2, 2016) that addresses this exact issue, wherein the Court found the ALJ's sole reliance on a claimant's positive response to completing the tenth grade was evidence of "basic literacy" was flawed when the claimant's literacy skills were untested, given that she had not been in school for over thirty years and has not received any specialized training. (Id. at 3.) Claimant asserts that the facts in Albritton and McCarter are more analogous to those herein: the ALJ found Claimant had a limited education based on his completion of the ninth grade from over thirty years ago and his answers on Social Security forms stating that he could read and write. (Id.) It is obvious that Claimant did not complete those handwritten forms. (Id.) Claimant emphasizes that a hospital evaluation revealed that he was unable to spell any of the five-letter words given to him during three trials. (Id.) Without conclusive evidence of Claimant's literacy, the ALJ's finding of his "limited education" was not supported by substantial evidence. (Id.)

Claimant also argues that the Commissioner's argument regarding his credibility is flawed, and notes that despite the ALJ's misgivings of his credibility, she found him credible to the extent that she limited her RFC assessment to exclude jobs that required reading instructions or writing reports. (Id. at 4.) Further, the Commissioner still had a duty to look into the issues regarding Claimant's disability and to develop a reasonably complete record, with or without representation. (Id.) Moreover, Claimant contends that he is not asking the Court to reweigh the evidence regarding the issue of literacy: the Commissioner lacked conclusive evidence to weigh in the first place. (Id. at 4-5.) Claimant concludes that had the ALJ performed her duties, and fully and fairly developed the record on the matter of Claimant's literacy, the Medical-Vocational guidelines would have found Claimant disabled. (Id. at 5.) The ALJ's failure in this regard is not harmless. (Id.)

Analysis

    1. <u>Literacy and Duty to Develop Record</u>

First, Claimant alleges that the ALJ erred in finding him illiterate, or alternatively, failed to fully develop the record on this issue. (Document No. 12 at 7-11.) The Medical-Vocational Guidelines, or Grid Rules, are found at 20 C.F.R. pt. 404, subpt. P, app. 2, and "contain[] numbered table rules which direct conclusions of 'Disabled' or 'Not disabled' where all of the individual findings coincide with those of a numbered rule." Social Security Ruling (SSR) 83-13, 1983 WL 31253, at *1 (S.S.A.). Claimant directs the Court's attention to Grid Rule 202.09, which categorizes as "disabled" those individuals who are: limited to light work, closely approaching advanced age, illiterate or unable to communicate in English, and have unskilled or no previous work experience. (Document No. 12 at 11.) The question of Claimant's ability to read or write is therefore a critical component in the overall analysis of his disabled status. (Document No. 14 at 5.) The Commissioner argues that the disability analysis does not hinge entirely on this component, as Claimant had additional exertional and non-exertional limitations, therefore the Grid Rules provide a more of a "framework", and not conclusive determinations of disability. (Document No. 13 at 9, fn 3.)

The ALJ found that Claimant had a limited education and was able to communicate in English. (Tr. at 102, Finding No. 8.) A limited education is defined as "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most the more complex job duties needed in the semi-skilled or skilled jobs." 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3). In the event a claimant attended formal education long before the onset of impairments, the regulations also provide:

> The importance of your educational background may depend upon how much time
> has passed between the completion of your formal education and the beginning of
> your ... impairment(s) and by what you have done with your education in a work or
> other setting. Formal education that you completed many years before your
> impairment began, or unused skills and knowledge that were a part of your formal
> education, may no longer be useful or meaningful in terms of your ability to work.
> Therefore, the numerical grade level that you completed in school may not
> represent your actual educational abilities.

20 C.F.R. § 404.1564(b).

The ALJ further found that Claimant's overall intellectual functioning to be in the average range as a result of a cognitive evaluation during the July 2012 hospitalization. (Tr. at 96.) The ALJ's finding of Claimant's limited education was based on a number of factors: the ALJ noted that Claimant reported that he was essentially illiterate and was able to hide his illiteracy from his employers. (Tr. at 96, 100, 101.) The ALJ further noted that Claimant had reported on a Disability Report that he was able to read and write (Tr. at 96, 101.), and had reported in a Function Report that he was capable of paying bills, handle a savings account, use a checkbook, and had to read instructions multiple times. (Id.) The ALJ noted that Claimant reported that he read at the first grade level (Tr. at 96.), and further noted that in the first administrative hearing, Claimant testified that he could not read or write at all, but he attended adult literacy classes and read close to the second grade level. (Tr. at 100.) Claimant has a driver's license, but reported that he had to have the test read to him. (Id.) The ALJ noted that Claimant had a ninth grade education, and that he was able to handle his own finances. (Tr. at 96.)

With regard to Claimant's complaint that the ALJ did not fully develop the evidence of Claimant's literacy or lack thereof, the Court notes that in Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The court stated that "[t]his circuit has held that the ALJ has a duty to

explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the evidence. Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he is disabled. 20 C.F.R. § 404.1512(a) (1999). Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that she has an impairment. Id. § 404.1512(c). In Bowen v. Yuckert, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings.  It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step.  The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as a claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). Claimant bears the burden of establishing a prima facie entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the

Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

Claimant contends that the ALJ did not properly evaluate the conflicting evidence regarding his illiteracy, instead relying primarily on his Social Security forms which indicated that he could read and write, and did not order a consultative evaluation in order to properly determine the degree of his illiteracy, and as a result, failed in her duty to develop the evidence on this issue. Claimant has cited persuasive opinions in McCarter v. Colvin, 2016 WL 411077 (S.D. Miss. 2016) and Albritton v. Sullivan, 889 F.2d 640 (5th Cir. 1989) in support of this argument. The Court has reviewed both cases and notes that in McCarter, the claimant therein had attained a tenth grade special education by 1975 and also testified that she could not read or write and could only keep up with her checking account "a little bit", and though she indicated on Social Security forms that she could read and write, it was clear the ALJ therein relied solely on those forms to find that claimant could perform other jobs requiring a second or third reading level, thereby rendering a decision not based on the substantial evidence.[9] The evidence of the claimant's illiteracy before the ALJ in Albritton, as distinguished from the case at bar, was unchallenged, and concerned a claimant that only went as far as the fourth grade, and whose wife also testified as to his illiteracy. Indeed, this Court notes that the record contains no school records referencing Claimant's difficulties in school, although Claimant testified that he did not learn to read and write but was promoted to the next grade regardless, and that he went as far as the ninth grade, in 1977. (Tr. at 142.) There is no indication in the record that Claimant was in special education courses. The record also contains no evaluation report or formal testing regarding Claimant's ability to read or

---

[9] Emphasis added. There were other findings by the ALJ therein that were not based on the substantial evidence, however, those are immaterial to the matters before this Court.

write despite having had two administrative hearings and having a representative at each one. The Court notes that the ALJ herein determined that a cognitive evaluation performed in July 2012 found Claimant to have average intellectual functioning, and further, Dr. Mark Hughes noted his suspicions that Claimant's "overall cognitive issues appeared, on the surface, might be related to his ADD symptoms." (Tr. at 588-589.) After a review of the record, the Court does not agree with Claimant that the ALJ failed to properly evaluate the issue of literacy or failed to develop the evidence. Indeed, it appears that the ALJ considered the record as a whole and decided that Claimant was not as illiterate as he alleged (Tr. at 102.), a finding supported by substantial evidence, and not just solely on his responses to Social Security forms.

2.  Credibility

The underlying record indicates that the ALJ assessed Claimant's symptoms to determine their consistency with the objective medical evidence, and clearly, Claimant's credibility had significant bearing on the literacy determination, which is the keystone to Claimant's disability claim and argument on appeal. (Tr. at 99-102.) A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a physical or mental impairment that reasonably could be expected to produce the pain or symptoms alleged.  20 C.F.R. §§ 404.1529(b) and 416.929(b) (2009); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).  If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated.  Id. at 595.  When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely

23

because the severity of pain cannot be proved by objective medical evidence." <u>Mickles v. Shalala</u>, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative.  <u>Hyatt v. Sullivan,</u> 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2009). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . .  Factors relevant to your symptoms, such as pain, which we will consider include:

>> (i) Your daily activities;

>> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.

>> (iii) Precipitating and aggravating factors;

>> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

>> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

>> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

>> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2009).

SSR 96-7p repeats the two-step regulatory provisions:

> First, the adjudicator must consider whether there is an underlying

24

medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain

itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 98-99.) The ALJ found at the first step of the analysis that Claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms[.]" (Tr. at 100.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 100-102.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. at 100.)

The ALJ found that Claimant's responses to questions about when he stopped working at Kroger's and Goodwill "somewhat evasive" (Tr. at 101.):

Q     How come you left the Kroger's?

A     Kroger's, I was actually under doctor's care at Prestera and Kroger's
      terminated me.

26

Q        Why?

A        Because they said that I needed to come back to work, and my doctor, he

         said, "I can't release you right now." He wouldn't give me a doctor's excuse

         to take back, and they wouldn't let me come back unless I had a doctor's

         excuse, so my union rep guy said that, basically, you're just quitting. I mean,

         they didn't just write - -

(Tr. at 134.)

                                    *****

Q        And what about the Goodwill job? What happened at that?

A        The Goodwill job, that's when I originally – I left there and went to

         Walmart.

Q        Yeah, but you were doing some part-time job at Goodwill in 2012, is that

         right?

A        Yeah. Well, I don't - -

Q        Why did you leave that?

A        I don't know if it was 2012, but yeah. I was a - - I couldn't do it after Mark

         gave me another - - gave me another job. I explained it to him. I said, "Mark,

         I just want to see if I can still do it," and I couldn't do it. So they just let me

         go.

Q        All right. Because when you were at Riverpark Hospital, you told them that

         you were fired from both the Kroger's job and the Goodwill job due to

         substance abuse.

27

(Tr. at 135.) Moreover, the ALJ noted that the record "contains a number of misleading statements from the claimant about his smoking habit." (Tr. at 101.) Claimant testified that he lied to his physicians about his smoking. (Tr. at 101, 139.) Claimant testified that he quit smoking two and a half years prior to the administrative hearing [March 25, 2014] (Tr. at 101, 138.), however, Claimant reported in July 2012 that he recently started smoking again. (Tr. at 101, 587.) Claimant testified that his alcohol and drug abuse only started six months prior to his July 2012 hospitalization (Tr. at 100.), however, River Park Hospital records from August and September 2012 indicate that Claimant reported he routinely snorted half a gram of heroin over the past decade and abused other drugs daily for the past thirty years, as well as alcohol a few times a week. (Tr. at 101, 586-587.) Though Claimant reported left hip and knee injuries from a motorcycle accident in 1991, there is no medical evidence supporting these allegations, and the ALJ noted that Claimant had a normal gait and no motor, sensory, or reflex loss. (Tr. at 101, 562, 589-590, 625, 689.) The ALJ further noted Claimant complained of chronic neck pain, and though an MRI of his cervical spine showed evidence of diffuse cervical spondylolysis with mild to moderate stenosis (Tr. at 568.), Claimant refused a referral to physical therapy or a neurological evaluation, and opted for treatment with Lortab instead (Tr. at 643.). (Tr. at 101.) Claimant alleged significant impairment to his left hand, but x-rays showed only minor degenerative changes. (Tr. at 101, 603.)

With regard to the opinion evidence, the ALJ assigned great weight to the opinion of Dr. A. Rafael Gomez, M.D. because it was "internally consistent and well supported by a reasonable explanation and the available evidence." (Tr. at 101.) This included diagnostic evidence of disc disease in the cervical and lumbar spines, but also the clinical evidence of no objective impairment to Claimant's gait or neurological deficits. (Tr. at 101, 562, 589-590, 625, 689.) The ALJ found that Claimant suffered from COPD, but noted good results with medication. (Tr. at 101, 509, 529,

624, 689.) The ALJ found Claimant reported that he was able to care for his own personal needs, prepare simple meals, and complete household chores. (Tr. at 101, 425-426.) Further, as the ALJ noted supra, Claimant lost his job at Kroger's and Goodwill due to substance abuse, as opposed to his physical limitations. (Tr. at 101-102.)

With regard to the opinions of Drs. Philip Comer, Ph.D. and Timothy Saar, Ph.D., the ALJ assigned "some weight" to their opinions due to "little objective evidence" of Claimant's emotional or mental barriers precluding his ability to perform simple tasks. (Tr. at 102.) Though both Drs. Comer and Saar found only mild limitations in Claimant's activities of daily living, social functioning and concentration, persistence, and pace, the ALJ could not find any evidence of one or two episodes of decompensation of extended duration supporting their opinions, as there was no evidence in the record of mental health treatment. (Id.) The ALJ noted that Claimant reported being stable on Celexa and Seroquel (Tr. at 635.), and further noted that the opinion of Dr. H. Hoback Clark, M.D., who found no evidence of episodes of decompensation, was more in accord with the evidence of record, and therefore assigned her opinion greater weight. (Tr. at 102.)

In summation, the Court finds that the ALJ did not "solely" rely on the fact that Claimant indicated that he could read and write on Social Security forms in finding that he had a "limited education" and therefore not as illiterate as he asserted; also the ALJ's credibility assessment had significant bearing on that finding. As noted above, the ALJ also considered the fact that Claimant was passed to each grade through the ninth grade, despite his failing grades and inability to read or write. (Tr. at 142-143.) The ALJ also considered the numerous instances of Claimant's conflicting statements, and admissions to lying to treating physicians, supra. In addition to the medical evidence of record and Claimant's testimony(-ies), the ALJ's ultimate finding that

29

Claimant was not as illiterate as he represented, and not disabled, was based on substantial evidence. Under the circumstances in this case, the Court finds that the ALJ developed the evidence of record in this case, and despite Claimant's contention that the evidence regarding his literacy was conflicting and that the ALJ should have ordered an evaluation, such action could have easily been arranged by Claimant himself.

As noted above, it is the responsibility of the Commissioner, not this Court, to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). In this case, the Court finds that the ALJ did that, and pursuant to the holding in Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974), the Court finds that the ALJ's decision was rational. Accordingly, the undersigned finds that the ALJ's credibility assessment conformed to the factors set forth in the Regulations and was supported by the substantial evidence of record, as well as her determination that Claimant was not disabled.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 12.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 13.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections,

30

identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Judge Chambers, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: September 8, 2016.

Omar J. Aboulhosn
United States Magistrate Judge